UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| **JOSEPH BRENT MATTINGLY,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **NO. 5:19-CV-170-JMH-MAS** |
| **v.** | ) | |
| | ) | |
| **R.J. CORMAN RAILROAD GROUP,** | ) | |
| **LLC, et al.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

The Court previously conducted a teleconference concerning the parties' current discovery dispute. [DE 37]. It issued an informal, provisional ruling on the matter. [DE 38]. Plaintiff subsequently sought additional and modified relief. [DE 39]. The issues in dispute are fully briefed and ripe for resolution. [DE 43 (Response), 44 (Reply), 45 (Limited Surreply)].[1] For the reasons that follow, the Court denies the motion.

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

This action arises out of a January 2017 accident that occurred while Plaintiff Joseph Brent Mattingly ("Mattingly") was performing maintenance work on the Memphis Line railroad. [DE 1, ¶ 10].[2] Mattingly avers that the Memphis Line was owned and managed by one or more Defendant entities (collectively referred to as "R.J. Corman"). [*Id.*]. While working on the railroad

---

[1] After separate briefing on the surreply question, the Court permitted consideration of the brief filing but declined to strike the challenged portion of the DE 44 Reply. [DE 51].
[2] The operative First Amended Complaint [DE 13] did not substantively alter any factual allegations. A second amendment motion pends. [DE 32].

bridge (positioned more than twelve feet above the ground or water), Mattingly, at his employer's directive, placed himself in a "man basket" to be lowered from the bridge for the purpose of retrieving necessary equipment. [*Id.*, ¶¶ 10, 12]. When the mechanism lowering the basket failed, the basket containing Mattingly free fell into the ravine below. [*Id.*, ¶ 12]. Mattingly sustained several serious injuries during the incident. [*Id.*, ¶ 14]. Mattingly alleges that R.J. Corman negligently flouted applicable railroad safety rules and failed to implement reasonably safe procedures surrounding use of the man basket. [*Id.*, ¶ 13]. He asserts that R.J. Corman is liable for compensatory damages under the Federal Employers Liability Act, 45 U.S.C. §51, *et seq.* ("FELA"). [*Id.*, ¶ 16].

The current discovery dispute hinges broadly on Mattingly's requests for three categories of material: (1) formal responses to Mattingly's Fourth Requests for Production of Documents; (2) production of various documents housed on R.J. Corman's internal "Depot" database;[3] and (3) an external audit of all R.J. Corman entities from 2016 and 2017. The Court previously conducted an informal telephonic conference with all counsel to discuss the dispute [DE 37] and issued a provisional ruling [DE 38].[4] Specifically, the Court found that R.J. Corman was required to produce any Depot documents that were otherwise responsive to Mattingly's discovery requests, but that R.J. Corman did not have to create or produce an index, which R.J. Corman argued did not exist. The Court further declined to compel production of the external audit, finding that it was not proportionate to case needs because it contained sensitive financial details about

---

[3] Per the parties, R.J. Corman had already permitted Mattingly's counsel to explore the Depot database, with defense counsel controlling access and displaying various Depot documents via a projector. Mattingly sought copies of several documents identified during that process and additionally, pursuant to the written discovery request, sought an index of all Depot documents.

[4] Though the informal discovery call and provisional ruling related to inquires made in Mattingly's Fourth Requests for Production of Documents, the issue of compelling formal responses to the requests in their entirety was not then squarely before the Court.

nonparties, and the limited relevant information it likely contained was already available to Mattingly through less burdensome means.

Consistent with the discovery dispute procedure applicable in this case, Mattingly subsequently filed a formal motion to compel production of the materials in all three categories. [DE 39]. However, by the time briefing on the motion concluded, the parties agreed that R.J. Corman had, at this stage, adequately responded to the Fourth Requests for Production of Documents and the Depot-related document requests. [DE 43, 44]. Thus, the Court addresses and resolves the sole remaining issue—whether R.J. Corman should be compelled to produce the 2016-17 external audits.

## II.   ANALYSIS

Under Rule 26, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1). In evaluating proportionality, the Court must "consider[] the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* Evidence need not be ultimately admissible to be discoverable. *Id.*

The Rules are structured "to allow broad discovery[,]" but such breadth "is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." *Scales v. J.C. Bradford & Co.*, 925 F.2d 901, 906 (6th Cir. 1991). "Although a plaintiff should not be denied access to information necessary to establish her claim, neither may a plaintiff be permitted to go fishing" for potentially relevant information in an unduly burdensome manner. *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007) (internal quotation marks omitted). Courts may decline to compel "discovery which meets the

general standard of relevance . . . if the discovery is unreasonably cumulative or duplicative, can be obtained from some other source which is more convenient, less burdensome, or less expensive, or if the party seeking the information has had ample opportunity to obtain it in the action[.]" *Brown v. Mohr*, No. 2:13-CV-0006, 2017 WL 2832631, at *1 (S.D. Ohio June 30, 2017), *aff'd*, No. 2:13-CV-06, 2017 WL 10056799 (S.D. Ohio Nov. 6, 2017); *accord Ward v. Am. Pizza Co.*, 279 F.R.D. 451, 458 (S.D. Ohio 2012).

Mattingly has established that the external audit documents likely contain information relevant to his FELA liability arguments.  The central question is whether Mattingly could properly be characterized as an employee of the R.J. Corman railroad entities at the time of the accident— either because the railroad divisions of the company had sufficient supervision and control over the manner and details of Mattingly's work, or because the subsidiary R.J. Corman entity then employing Mattingly was functionally an alter-ego of the railroad entities, and the companies were essentially a single, unified operation.  *Campbell v. BNSF Ry. Co.*, 600 F.3d 667, 673 (6th Cir. 2010).  The distinction between the two theory variants has little practical impact on the instant discovery dispute.  In either scenario, Mattingly fairly must have adequate opportunity to explore such topics as R.J. Corman's corporate structure, its internal financial organization, and the policies and procedures dictating the railroad entities' relationship with the subsidiary entities and their employees.  Whether the audit is relevant because it contains information about the railroad entities' functional consolidation with the subsidiaries (including Mattingly's employer) or because it offers insight into the railroad entities' direct relation to the subsidiary employees makes little difference, at this stage.

Regardless of which theory provides the lens, the audits surely cross the Rule 26 relevance bar.  *See, e.g., Herriges v. Cty. of Macomb*, No. CV 19-12193, 2020 WL 4726940, at *2 (E.D.

Mich. Aug. 14, 2020) (emphasizing that "[t]he requesting party has an extremely low bar for showing relevance" under Rule 26(b)) (quotation marks omitted).  Indeed, Defendants recognize that the audits may contain some information about the consolidation of R.J. Corman's financials (under the R.J. Corman Railroad Group, LLC ("Group") umbrella) and its tax structuring.  The record further indicates that the audits may confirm that certain subsidiary activities, *e.g.*, hiring of particular employees, purchases over a specified dollar amount, etc., must be approved by higher-up corporate officers within the Group.  These themes are undoubtedly germane to Mattingly's case, and he must be allowed some room to explore proof supporting them.

But relevance is only the threshold. The Court must also consider proportionality, weighing Mattingly's need for and interest in the sought information against the potential burden on R.J. Corman if required to produce it.  Driving factors in this case include the (limited) value of the audits to Mattingly's case, Mattingly's ability to learn the relevant information through other, less intrusive means, and the prejudice and burden that R.J. Corman would suffer if forced to disclose the audits.

Critically, though the broad factual propositions Mattingly seeks to establish via the audits are relevant to his theory, the granular details that an audit would reveal—such as which employees of the Group must approve which activities, what dollar amounts trigger such higher-up approval in various contexts and who must be involved, etc.—are beyond what is needed to effectively make the arguments Mattingly pursues.  The record indicates that Mattingly already has learned and/or has had ample opportunity to learn the relevant information that the audits would provide through written discovery and through depositions of various R.J. Corman officers.  For example, R.J. Corman's Rule 30(b)(6) representative Patrick Johnson testified in considerable detail about his knowledge of the R.J. Corman entities' tax structure, explaining that the tax reporting flows

upward and ultimately is reported in the aggregate at a level even higher than the Group. [DE 43-1, at Page ID # 288–90]. Johnson further testified that the entire set of R.J. Corman entities is collectively audited annually, and that the income from all subsidiaries is pooled and maintained by the controlling umbrella entity rather than remaining with each individual R.J. Corman company. [*Id.*, at Page ID # 290–91]. Johnson also confirmed that all subsidiary entities' proposed budgets flow through him as finance representative for review, and then all must receive final approval from the R.J. Corman Estate or Trust. [DE 44-1, at Page ID # 305–06].[5]

This testimony binds Defendants and provides substantial insight into R.J. Corman's financial consolidation and unified tax structuring for purposes relevant to Mattingly's FELA theory. And Mattingly had ample opportunity to explore these facts as much as he wished during Johnson's deposition. *See Majestic Bldg. Maint., Inc. v. Huntington Bancshares Inc.*, No. 2:15-CV-3023, 2018 WL 3358641, at *12 (S.D. Ohio July 10, 2018) (quoting *Sabre v. First Dominion Capital, LLC*, 01-cv-2145, 2001 U.S. Dist. LEXIS 20637, 2001 WL 1590544 (S.D.N.Y. Dec. 12, 2001) ("A 30(b)(6) witness testifies as a representative of the entity, his answers bind the entity and he is responsible for providing all the relevant information known or reasonably available to the entity.")).

There is no concrete indication that the audits would provide relevant information beyond what Mattingly already has learned—or has had the opportunity to learn—through the various

---

[5] Mattingly also had opportunity to ask Johnson about any subsidiaries' hiring decisions that may have been routed through Johnson as R.J. Corman's former Vice President of Finance and Accounting. In his September 29, 2020 deposition, R.J. Corman General Counsel William Booher testified that he believed hiring decisions that would impact payroll would have had to run through finance, and that Johnson would have more information about those details. [DE 44-3, at Page ID # 319]. Mattingly could have explored this topic to the extent he wished during Johnson's October 2, 2020 deposition, providing further detail about Defendants' consolidated financials and their practical effect on the subsidiaries' operations.

depositions.  Though Mattingly seeks information related to documents purporting to reflect certain staff policies [DE 44-2], multiple R.J. Corman representatives testified that they did not believe those policies were in place at the time of the events in this case.  [DE 44-3, 44-4].  And there is no reason to believe that the audit would contain any further details relevant to that particular question.  Indeed, Johnson testified that the audit did *not* encompass any general review of policies or procedures, beyond information concerning internal fraud and other finance-specific controls (such as levels of approval for various types of expenditures, etc.).  [DE 44-1, at Page ID # 301–03].

Johnson's testimony and Defendants' position regarding audit scope is consistent with Statement on Auditing Standards ("SAS") No. 78.  SAS No. 78 does, in fact, define "internal control" to encompass details about a company's structure beyond mere finances.  In addition "reliability of financial reporting," SAS No. 78 directs auditors to consider the "effectiveness and efficiency of operations," as well as a company's "compliance with applicable laws and regulations."  American Institute of Certified Public Accountants, Auditing Standards Board, *Consideration of Internal Control in a Financial Statement Audit: An Amendment to SAS No. 55* (Dec. 1995), https://egrove.olemiss.edu/cgi/viewcontent.cgi?article=1080&context=aicpa_sas ("SAS No. 78"), at p. 3, ¶ 6.

However, SAS No. 78 explicitly relates to what auditors must consider when *planning* an audit—it does *not* dictate precisely what information the resulting audit itself must include.  *See id.* at p. 2, ¶ 1 (emphasizing that "[i]n particular, this Statement provides guidance about implementing the second standard of field work[,]" and that "[a] sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed") (footnote omitted).  In other words, though SAS No. 78 directs that

7

auditors examine internal company controls before finalizing the audit plan and deciding what information to collect from the company and how to collect it, it does not purport to require auditors to include all such information in the audit produced.  Rather, SAS No. 78 repeatedly limits the scope of included information to details tied to the company's financials.  *See, e.g.*, *id.* at p. 3, ¶ 9 ("Although an entity's internal control addresses objectives in each of the categories referred to in paragraph 6, not all of these objectives and related controls are relevant to an audit of the entity's financial statements."); *id.* at p. 4, ¶ 10 ("Generally, controls that are relevant to an audit pertain to the entity's objective of preparing financial statements for external purposes . . ."); *id.* at p. 6, ¶ 14 ("[T]he auditor's primary consideration, however, is whether a specific an internal control structure policy or procedure affects financial statement assertions[.]").  SAS No. 78 thus does not contradict or refute Johnson's testimony—or the typical practice—that audits center around a company's financial details, rather than any general review of company policy.

In the end, Plaintiff suggests that the audit would reveal "for example, the procedure establishing authorizations for approving actions and transactions within the company, *i.e.*, what level of company officer has authority to approve budgets, hiring decisions, purchases over a certain level or other capital transactions."  [DE 44, at Page ID # 297].  But Mattingly has already had an adequate opportunity to probe those very topics during depositions and written discovery. As noted, Johnson testified in detail about the budget process, and Mattingly could have asked any questions he wished on the topic.  [DE 44-1, at Page ID # 305–06].  Booher discussed how payroll and hiring would impact budgetary review, noting that Mattingly could ask Johnson further questions about that matter.  [DE 44-3, at Page ID # 319].  Nor is there any reason to believe that Mattingly could not have queried any of the R.J. Corman representatives about company procedure regarding approval of large transactions or expenditures.  Information of the sort Mattingly seeks

from the audits was undoubtedly available to him through other discovery efforts. And the sort of details that only the audits themselves could provide—namely, the financial specifics—are not reasonably needed to develop Plaintiff's case, as Mattingly concedes in suggesting their redaction.

For these reasons, the Court is not persuaded that the audit would reveal any appreciable quantum of evidence that Mattingly has not or could not have previously obtained in this action. Mattingly has had ample opportunity to explore the categories of proof he argues the audit would cover through depositions and written discovery. The financial specifics are not relevant, and there is simply no non-speculative evidence that the audit would include broader policy and procedure review. Rather, R.J. Corman has provided testimony stating that the opposite is true, and such testimony is not inconsistent with the auditing and accounting standards Mattingly cites. Plaintiff's hypothetical doubt that R.J. Corman is honestly and fairly representing the audit's scope is precisely the sort of "fishing" effort that the Court may not indulge. *See Surles ex rel. Johnson*, 474 F.3d at 305. Accordingly, given Mattingly's prior access to the sought information, the audits are likely cumulative and of relatively low importance to the issues at stake in this litigation, even if they have base relevance to Mattingly's case. *See Brown*, No. 2017 WL 2832631, at *1.

Against the relatively low evidentiary value of the audits in this case, the Court balances the burden on and prejudice to R.J. Corman if such production were compelled. *E.E.O.C. v. Ford Motor Credit Co.*, 26 F.3d 44, 47 (6th Cir. 1994) ("Essentially, this court's task is to weigh the likely relevance of the requested material to the investigation against the burden . . . of producing the material."). R.J. Corman argues that the audit contains confidential financial details about nonparties (*e.g.*, other Corman entities and information about the Corman family trust that controls the Corman entities generally) and that disclosure risks undue intrusion into sensitive and minimally relevant information. The Court agrees. *See, e.g.*, *Equal Employment Opportunity*

9

*Comm'n v. Tepro, Inc.*, No. 4:12-CV-75-HSM-SKL, 2014 WL 12562856, at *6 (E.D. Tenn. Aug. 29, 2014) (citing *Knoll v. Am. Tel. & Tel. Co.*, 176 F.3d 359, 365 (6th Cir. 1999)) (observing that "[t]he Sixth Circuit has recognized privacy interests in discovery disputes, particularly with respect to the privacy interests of nonparties").  In response, Mattingly asserts that the audits could be produced with all financial figures fully redacted.

However, under the circumstances, the Court perceives this solution both as unwarrantedly burdensome and as insufficiently protective of the private information contained in the audits.  First, though the record is silent as to the nature and extent of any redaction burden, the Court recognizes that at least some time, cost, and effort would be required to redact all financial figures in documents explicitly focused on company finances.  And the likelihood of additional litigation stemming from the redactions themselves is particularly strong.  Even setting that aside, redaction of the sensitive financial information does little to guarantee the privacy of R.J. Corman's financial data.  For instance, even if R.J. Corman were to redact all numbers in any given audit category, the mere inclusion of a particular category—or the existence of a lengthy section under a particular heading—would reveal significant information about the state of a private company's finances and about nonparty entities.  Context alone, even without the numbers, could be harmful when discussing a detailed financial audit.

Ultimately, compelling production of the audits and requiring R.J. Corman to take the risk of revealing such confidential information is unjustified in this case.  Weighing the redaction burden on R.J. Corman and the potential harm to nonparties' legitimate privacy interests in the content of the audits against the minimal importance of the audits to Mattingly's case, the Rule 26 proportionality calculus does not favor compelling their production under the circumstances. Mattingly has had adequate access to the relevant information sought via substantially less

intrusive sources, and there is no evidence that the audits would provide any new and noncumulative relevant information. *See* Fed. R. Civ. P. 26(b)(2)(C). Accordingly, production of the sought audits is not proportionate to the reasonable discovery needs in this case per Rule 26, and the Court, in its discretion, declines to compel it.

### III.   <u>CONCLUSION</u>

For all of these reasons, the Court **DENIES** Mattingly's motion seeking additional or modified discovery relief [DE 39] insofar as he seeks to compel production of the audits, and the Court **DENIES AS MOOT** the motion's remaining requests. The undersigned enters this Memorandum Opinion pursuant to 28 U.S.C. § 636(b)(1)(A). Within fourteen (14) days after being served with a copy of this Memorandum Opinion, either party may appeal this decision to Judge Hood pursuant § 636(b)(1)(A) and FED. R. CIV. P. 72(a).

Entered this 17th day of February, 2021.



Signed By:
Matthew A. Stinnett
United States Magistrate Judge