UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

JOSEPH BRENT MATTINGLY        )
                              )
        *Plaintiff*,          )
                              )        Civil Action No.
v.                            )        5:19-CV-00170-JMH
                              )
R.J. CORMAN RAILROAD GROUP, LLC )
                              )
and                           )        MEMORANDUM OPINION
                              )          AND ORDER
R.J. CORMAN RAILROAD          )
SERVICES, LLC                 )
                              )
        *Defendants*.         )

* * *

This matter is before the Court on two motions for summary
judgment, filed by Plaintiff [DE 62] and Defendants [DE 63], on
the limited issue of the application of the Federal Employers'
Liability Act, 45 U.S.C. § 51 ("FELA"). For the reasons stated
herein, the Court finds that FELA is not applicable.

## I.    BACKGROUND

On January 26, 2017, Plaintiff Joseph Brent Mattingly was
injured while at work. At the time of his injury, Mattingly was
employed by R.J. Corman Railroad Services, LLC ("Services"), which
was conducting repairs on a bridge owned and operated by R.J.
Corman Railroad Company/ Memphis Line ("Memphis Line").

In February of 2019, Mattingly brought suit against Services[1] and R.J. Corman Railroad Group, LLC ("Group"). In September of 2020, Mattingly filed a motion for leave to file a Second Amended Complaint, which would join Memphis Line as an additional defendant. [DE 32]. The Court granted the motion over Defendants' objections. [DE 73].

Defendants are related through their corporate structure. Group, a holding company, is the sole member of R.J. Corman Railroad Company, LLC ("Railroad Company"), Services, and several other entities. Defendants claim that Group, Services, and Railroad Company are not common carriers by railroad. Railroad Company is the sole shareholder of Memphis Line, which Defendants concede is a common carrier by railroad.

## A. GROUP'S ROLE WITH ITS SUBSIDIARIES

Due to the corporate structure, Group takes responsibility for several administrative tasks, choosing a joint approach. For example, because Group files a single tax return accounting for its subsidiaries' income and expenses, none of the separate subsidiaries file a federal tax return. Group procures a single workers' compensation policy, general insurance policy, automobile liability policy, life insurance policy, and health insurance benefits for all its subsidiaries and offers a single retirement

---

[1] Originally, Mattingly's Complaint listed "R.J. Corman Railroad Construction, LLC" but in his First Amended Complaint [DE 13], Mattingly corrected the name to "R.J. Corman Railroad Services, LLC."

plan. In 2018, all the Group subsidiaries filed a joint security agreement listing all assets in order to perfect a security interest. In accordance with 49 U.S.C. § 11323, which requires approval by federal Surface Transportation Board (STB) before an entity can purchase or acquire control of a railroad, Group jointly filed a Notice of Exemption. In applying for public grant funding to rehabilitate railroad tracks, Group used its own letterhead and discussed the history of Services. To settle a Fair Labor Standards Act lawsuit, Group signed an agreement that released all Group subsidiaries.

Group implements Senior Staff Policies that, among other things, require Group officers to approve inter-company employee transfers, designate the Group president to be in charge if an organizational crisis occurs, and adopts a 5-year plan for rehabilitation of the short-line railroads. Group also implements an Employee Discipline Policy. Defendants admit these policies were produced and available but state the policies were not followed. The subsidiaries are required to adhere to the safety protocols developed by Group, and Group conducts an annual mandatory safety training for employees of the subsidiaries.

In the event rail lines are damaged by inclement weather, employees of all Corman entities are subject to assignment on the storm team. Group can issue a "stand down" order, which requires

3

all entities to shut down. At times, employees of one Group subsidiary would fill in for a different subsidiary.

Group provides significant administrative services for its subsidiaries including payroll, accounting and finance, legal, human resources, information technology, public affairs, aircraft pilot services, risk management, purchasing and procurement of commercial development services. The subsidiaries pay Group an administrative fee for many of the services.

At times, subsidiaries must seek Group's approval. For example, the president of Group must approve the annual budget of every subsidiary, and purchases over a specified amount must be approved by the president or vice-president. In 2013, Group officers approved Mattingly's transfer from Group to Services and subsequent promotion.

Marketing material places emphasis on the "Sou1rce" logo and "One Source" idea. Its website promotes the following:

> R.J. Corman is the One Source service provider for all facets of railroading. Although we are made up of several entities, our individual companies come together to form a custom package to respond to our customer's unique needs. All companies and service groups are unified under one R.J. Corman banner and adhere to the same set of core values in order to provide consistent, high quality solutions for our customers.

RJ Corman Railroad Home Page, www.rjcorman.com.

The subsidiaries are subject to different labor regulations. Railroad employees fall under the Railway Labor Act, are covered by FELA, and contribute to railroad retirement. While non-railroad employees adhere to the National Labor Relations Act, are covered under state workers' compensation laws, and contribute to social security for retirement.

### B. MEMPHIS LINE'S RELATIONSHIP WITH SERVICES

Even though Railroad Company did not use Services exclusively for repairs and usually solicited bids for bridge work, most work was performed by Services. Railroad Company was charged at the actual cost of labor and equipment, not the market rate. Services also did repair work for other railroads not associated with Corman.

At the time of his injury, Mattingly was doing repair work on a bridge owned and operated by Memphis Line in Clarksville, Tennessee. Services had been retained to repair two bridges, the Cumberland Bridge and the Red River Bridge (collectively the "Memphis Line Project"). Mattingly and Paul Childres were supervisors of the Memphis Line Project and employed by Services. Mattingly and Childres reported to Dickie Dillion, the operation manager employed by Services. The work crew supervised by Childres and Mattingly consisted of Services employees including Dillon Neace and Mike Wilson. Memphis Line and Railroad Company employees were also involved in the Memphis Line Project. Ed Quillian was

Railroad Company's Chief Engineer on Memphis Line's payroll, Jason Topolski was a Railroad Company bridge supervisor on Memphis Line's payroll, and Cain Jones was the Employee in Charge ("EIC") for the Memphis Line.

At the onset when a larger than expected Services work crew showed up, Railroad Company determined it would be more productive if one crew went to the Red River Bridge and the second crew went to Cumberland Bridge. [Topolski Deposition, at 23]. Mattingly supervised a crew on the Red River Bridge, and Childres supervised a crew on the Cumberland Bridge.

Railroad officers reviewed the scope of work with Services. Memphis Line personnel had inspected and identified areas of the bridge that needed repair. At the beginning of the project, Services was given a list indicating which bridge posts needed to be replaced. Upon receiving the list, Mattingly marked the posts with spray paint. [Mattingly Deposition, at 146-47]. Topolski was responsible for answering questions regarding the scope of work [Topolski Deposition, at 80], confirmed that Services was removing the correct posts, and explained how it should look at the end. [Topolski Deposition, at 78].

According to Mattingly, Topolski indicated which posts he wanted done first and what posts should be completed that day [Mattingly Deposition, at 150-55]. Mattingly also testifies that he gave his own crew their assignments every morning, assigning

the crew to equipment, ensuring the necessary tools were obtained, locating the material, and choosing which spot he wanted to work on that day. [Mattingly Deposition, at 69]. Quillian confirmed that on some work, that it would be expected that Mattingly, or the like, was expected to follow the specific direction of Topolski as to which post Topolski wanted worked on that day. [Quillian Deposition, at 95]. Topolski denies directing Services employees on which post number needed to be replaced on a given day or in a specified order, but admits that posts were prioritized when Services indicated that they were pulling out earlier and thus unable to finish the job, prompting Topolski to change the scope of work to prioritize the critical posts [Topolski Deposition, at 121-122] and that the only time Topolski intervened with Services' plan for the day was to inform the crew that a train may be coming through at a certain time, in which case Services would need to adjust their timeline to accommodate. [Topolski Deposition, at 132].

Complying with federal regulations, Memphis Line provided an EIC to the Memphis Line Project. The EIC communicated with dispatch to monitor railroad traffic in order to clear the track if a train needed to enter the work area. On projects outside of Corman lines, EICs would give the parameters of track time then oftentimes would not be seen again. But the Corman EICs were present during the workday, worked with the crews, and instructed workers where to go

and what to do. [Mattingly Deposition at 136] & [Childres Deposition, at 82]. When Topolski supervised the Memphis Line Project, he "wanted it done his way," was "pretty vocal, "whatever he said, that's what you did," "it had to be his way always," supervised the way posts were cut, and trained new employees on how to drill holes and cut posts. [Mattingly Deposition, at 137 & 151-159]. Topolski admits that there were times when he leaned on his own experience to show new crew members what he learned over the years. [Topolski Deposition, at 79].

While Quillian was not really involved in the Memphis Line Project nor present at the site [Mattingly Deposition, at 125] & [Childres Deposition, at 80], there is conflicting testimony regarding how often Topolski was at the bridge site. Mattingly claims he saw Topolski on a daily basis during the course of the project. [Mattingly Deposition, at 137]. Because he was still working on other projects in different states, Topolski states he was only present two to three days per week. [Topolski Deposition, at 118 & 121]. Neace testified that Topolski might have been present at the bridge briefly when the crew first arrived, but other than that was not present. [Neace Deposition, at 45]. However, Neace indicated that Jones would be on the Cumberland Bridge, running safety meanings and giving the parameters of track and time. [Neace Deposition, at 45]. Wilson similarly indicated that Topolski might have been at the Memphis Line Project the first

week, but after that Jones was the EIC. [Wilson Deposition, at 27-28]. Topolski would show up sometimes and leave, and Jones tended to stay at the Cumberland Bridge. [Wilson Deposition, at 49].

There is conflicting testimony regarding Memphis Line employee's physical involvement on the Project. Topolski denies pitching in to help Services employees with their work, noting that they did not need his work due to their ample workforce, but there were times when he might use a chainsaw to perform tasks outside of the scope of work, like using tools to cut brush. [Topolski Deposition, at 104]. Childres testified that Topolski and Jones performed labor on the project including cutting posts and using the chainsaw, which was not common for EICs when Services worked on non-Corman lines. [Childres Deposition, at 81]. Wilson testified that sometimes Jones would jump in and work, but Topolski "not so much." [Wilson Deposition, at 50]. Wilson specified that he was not sure what Jones was doing on the other bridge, but that he believed he was cutting posts, [Wilson Deposition, at 50] and he confirmed that at some point Topolski brought a man lift over to the Cumberland Bridge and trained others on how to operate it. [Wilson Deposition, at 29]. Topolski confirmed that he used a manlift on the Memphis Line Project to perform his inspections easier. [Topolski Deposition, at 102].

While Services employees would listen to Memphis Line supervisors, Services employees knew to first follow Childres or

Mattingly. Quillian stated that if he had a specific instruction for Mattingly or Childres that he would not expect them to immediately comply with his direction but would expect a discussion. [Quillian Deposition, at 100]. Childres indicated that hypothetically if Quillian were to ask him to do something related to his supervisor position, Childres would do it, but when asked about specific examples of Quillian supervising bridge projects, Childres indicated that if he had a question, he might call Quillian. [Childres Deposition, at 25]. If Topolski and Dillon issued conflicting orders, Childres guessed he would ultimately follow Dillon, but that it would depend on the situation. [Childres Deposition, at 82]. While Neace indicated that Quillian supervised a different project in the Carolinas requiring him to adhere to his instruction, Neace does not testify similarly for the Memphis Line Project, [Neace Deposition, at 43], and Neace would not follow Cain's instructions about work, unrelated to safety or track and time authority, without first asking Childres or Mattingly. [Neace Deposition, at 45].

Mattingly first explains that he had two bosses who would tell him where to go and give him assignments, Dillon and Childres. [Mattingly Deposition, at 44]. While Mattingly was his own supervisor, he also considered Childres and Topolski to be his supervisors as well. [Mattingly Deposition, at 122-123]. When Railroad and Services people were working together on the track,

Services would adhere to Railroad's orders, and this included Childres and Mattingly taking orders from Topolski. [Mattingly Deposition, at 138].

Services supervisors were required to send daily production reports to Railroad Company, Memphis Line, Services, and Group officials detailing what was completed and how many hours the tasks took. [Topolski Deposition, at 130] [Quillian Deposition, at 96]. Railroad supervisors asked Mattingly to include the exact location of work completed and include the post number. Corman007110 and Corman007240.

Railroad Company supplied the material for the Memphis Line Project and arranged for its delivery to the sites. Topolski specified what material should be used on specific posts to stretch material out and how material, like bolts, would be provided to Services. Corman006674-006676.

Services kept track of their hours worked and travel expenses. Checks for Services employees on the project came from Services' bank account. [Johnson Deposition, at 47-50].

At the beginning of every workday on the Memphis Line Project a safety meeting was conducted. Sometimes Childres or Mattingly conducted the meetings. [Childres Deposition, at 74] & [Mattingly Deposition, at 66 & 125]. Other times Quillian, Topolski, or Jones conducted the safety meetings. [Mattingly Deposition, at 66 & 125], [Childres Deposition, at 74], &[Topolski Deposition, at 118].

On the day of the accident, Childres brought Mattingly's crew replacement chains for their chainsaws. In order to retrieve the chains and converse with Childres, Mattingly climbed into a man-basket that was attached to crane. The winch mechanism failed, causing Mattingly to fall from a significant height. Mattingly suffered a severe injury, which ultimately resulted in the amputation of his lower leg. No Group, Railroad Company, or Memphis Line employee was present at the Red River Bridge when the accident occurred. [Mattingly Deposition, at 145].

## II.  Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine dispute" exists when "a reasonable jury could return a verdict for the non-moving party." *Olinger v. Corporation of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)); *Smith v. Perkins Bd. Of Educ.*, 708 F. 3d 821, 825 (6th Cir. 2013). In the Court's analysis, "the evidence should be viewed in the light most favorable to the non-moving party." *Ahlers v. Schebil*, 188 F. 3d 365, 369 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 255). However, "[s]tatements in an affidavit which are based on information and belief or which are unsupported conclusions, opinions, or speculation are insufficient to raise a

12

genuine issue of material fact." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 132 (1992).

The initial burden falls on the moving party, who must identify portions of the record establishing the absence of a genuine issue of material fact. *Chao v. Hall Holding Co.*, 285 F. 3d 415, 424 (6th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If established, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Id*. The non-moving party will not overcome a motion for summary judgment by simply showing "some metaphysical doubt as to the material facts." *Id*. (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). In other words, "the respondent must adduce more than a scintilla of evidence to overcome the motion*." Street v. J.C. Bradford & Co.*, 886 F. 2d 1472, 1479 (6th Cir. 1989). As a "mere scintilla of evidence" is insufficient, the non-movant must show the existence of "evidence on which the jury could reasonably find for the non-moving party." *Sutherland v. Mich. Dept. of Treasury*, 344 F. 3d 603, 613 (6th Cir. 2003) (citing *Anderson*, 477 U.S. at 251). Instead, the non-moving party is required to "present significant probative evidence in support of its opposition." *Chao*, 285 F. 3d at 424.

### III. Discussion

FELA is a "broad remedial statute" that is to be "liberally construed" to provide "a federal remedy for railroad workers who suffer personal injuries as a result of the negligence of their employer." *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 561-62 (1987). FELA provides that:

> Every common carrier by railroad while engaging in commerce between any of the several States or Territories, . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce. . .

There are four points that must be established for a plaintiff to recover damages under FELA:

> First, they must establish that the defendant is a common carrier by railroad engaged in interstate commerce; second, they must prove that they were employed by the defendant and assigned to perform duties which furthered such commerce; third, they must demonstrate that their injuries were sustained while they were employed by the common carrier; and finally, they must prove that their injuries resulted from the defendant's negligence.

*Felton v. Southeastern Pennsylvania Transp. Authority*, 952 F.2d 59, 60 (3rd Cir.1991). The first two requirements, common carrier status and employment, are at issue in this case.

Mattingly argues that FELA liability applies based on two separate theories. First, Mattingly claims that FELA liability extends to an entity whose "parent holding company owns common carrier subsidies and owns, manages, and controls all of its subsidiaries as a unitary, organized railroad system" (the

14

"unitary theory") making the entity a common carrier by railroad. Second, Mattingly claims that even if Services is not a common carrier by railroad, Mattingly was also employed by Memphis Line, which is a common carrier by railroad, because FELA liability applies when the "injured worker is acting under direction, supervision, management and control of a parent holding company and one of its common carrier subsidiaries." The Court addresses each argument in turn.

### A. UNITARY THEORY

FELA defines the term "common carrier" to "include the receiver or receivers or other persons or corporations charged with the duty of the management and operation of the business of a common carrier." 45 U.S.C. § 57. In 1968, the Supreme Court defined common carrier by railroad as "one who operates a railroad as a means of carrying for the public,--that is to say, a railroad company acting as a common carrier." *Edwards v. Pacific Fruit Express Co.*, 390 U.S. 538, 540 (1968). An entity is also a common carrier if it "holds [itself] out to the public as engaged in the business of transportation of persons or property from place to place for compensation, offering [its] services to the public generally." *Kelly v. Gen. Elec. Co.*, 110 F. Supp. 4, 6 (E.D. Pa. 1953). Plaintiff bears the burden of proving that the defendant is a common carrier by railroad and "must present affirmative evidence

indicating such." *Mickler v. Nimishillen and Tuscarawas Railway Co.*, 13 F.3d 184, 189 n. 3 (6th Cir. 1993).

Plaintiff's brief points to *Southern Pacific Terminal Co. v. Interstate Commerce Comm.*, 219 U.S. 498 (1911), as the founding case for the unitary theory. The issue before the court was whether Southern Pacific Terminal Co. ("SP Terminal"), a wharfage company, was within the jurisdiction of the Interstate Commerce Commission ("ICC"). *Southern Pacific*, 219 U.S. at 514. The question turned upon whether SP Terminal was a common carrier.

In holding that SP Terminal was a common carrier for purposes of ICC jurisdiction, the court partially focused on the "control of the properties by the Southern Pacific Company through stock ownership." *Id*. at 522. The Southern Pacific Company owned 99% of SP Terminal and 99% of multiple individually incorporated railroads. The court looked beyond the corporate form, noting that "[t]here is a separation of the companies if we regard only their charters; there is a union of them if we regard their control and operation through the Southern Pacific Company." *Id*. at 521.

However, it was not merely mutual ownership that transformed SP Terminal into a common carrier, but that the owner, the Southern Pacific Company, "united them into a system of which all are necessary parts." *Id*. SP Terminal was the only track facility whereby cars were able to move in between the ships and the tracks of the Southern Pacific Railways. Because of this exclusivity, SP

16

Terminal "forms a link in this chain of transportation" and is "necessary in the transportation or delivery" of freight transported by the Southern Pacific Company system. This was not a case where the holding company "was content to hold." Instead, the Southern Pacific Company was "actively managing and uniting the railroads and the Terminal Company into an organized system." *Id.* at 523. Thus, *Southern Pacific* finds that when a holding company controls and operates a subsidiary that is not a common carrier so that it becomes a necessary link in the chain of transportation with the holding company's other common carrier subsidiaries, that non-common carrier entity is to be treated as a common carrier.

*Southern Pacific* cannot support Mattingly's argument because Group has not actively united Memphis Line and Services so that Services is a necessary link in the chain of transportation. Unlike SP Terminal, which was the only avenue by which cars could get from ships to Southern Pacific Railways, Services does not serve as a physical link in the chain of transportation nor has Group united the two companies so that Services plays an exclusive role in the chain. Services performed bridgework for other railroad clients, and Railroad Company solicited bids from other repair teams.

Plaintiff next points to *United States v. Union Stock Yard & Transit Co.*, 226 U.S. 286 (1912), as further support for his

unitary theory. The issue before the court was whether the Union Stock Yard & Transit Company of Chicago ("Stock Yard Company") was a common carrier subject to the Interstate Commerce Act. Originally, Stock Yard Company was "organized for the purpose of maintaining a stock yard. . . and it was authorized to and did own and operate a railroad system." *Id*. at 302. However, the Junction Company began operating the railroad portion of the operation, though the Stock Yard Company still received two-thirds of the profits in connection with the railroad transportation. The stock of both companies was held by the same investment company. The court held the companies were subject to the Act as common carriers "because of the character of the service rendered by them, their joint operation and division of profits and their common ownership by a holding company" explaining that "[t]ogether, these companies. . . engage in transportation within the meaning of the act and perform services as a railroad when they take the freight delivered at the stock yards, load it upon cars and transport it. . . or receive it while it is still in progress in interstate commerce upon a through rate which includes the terminal services rendered by the two companies, and complete its delivery to the consignee." *Id*. at 306.

*Union Stock Yard* cannot support Mattingly's unitary theory. While the court considered their common ownership in rendering a decision, the court pointed to other important factors that are

not present in this case. First, the duties performed by Memphis Line were never originally performed by Services, nor did Services receive two-thirds of Memphis Line's profit from their railroad operations. Lastly, unlike the situation in *Union Stock Yard* and *Southern Pacific*, neither Services nor Group is a linking carrier.

Mattingly also relies on *Lone Star Steel Co. v. McGee*, 380 F.2d 640 (5th Cir. 1967), where the court held that Lone Star, a steel company that operated a rail trackage system within its plant, was a common carrier and listed multiple considerations for determining whether an entity is a common carrier under FELA:

> First -- actual performance of rail service, second -- the service being performed is part of the total rail service contracted for by a member of the public, third -- the entity is performing as part of a system of interstate rail transportation by virtue of common ownership between itself and a railroad or by a contractual relationship with a railroad, and hence such entity is deemed to be holding itself out to the public, and fourth -- remuneration for the services performed is received in some manner, such as a fixed charge from a railroad or by a percent of the profits from a railroad.

*Id*. at 647. The court noted that Lone Star's track system connected to a track operated by Texas & Northern Railway Company ("T&N"), a common carrier by railroad, and T&N's track extended into the Lone Star plant. More, Lone Star was virtually the sole stockholder of T&N. Lone Star performed rail services that were part of the total rail transportation, was "an integral part of the T&N system

19

of interstate transportation" by "regularly shuttling the goods of other business concerns located within its plant and thereby is performing a part of the total rail services which another railroad, T&N, has obligated itself to perform," and "receives in the form of dividends a part of the rate charged the industries by T&N." *Id*. The court clarified that this was not "a case of mere stock ownership" but "[i]nstead the record reflects that the operations of the two are highly integrated and mutually dependent" because Lone Star was a "necessary part" of the T&N's common carrier operations. *Id*. at 648.

*Lone Star* cannot support Mattingly's unitary theory. Neither Group nor Services operates an in-plant rail system and Memphis Line is not physically connected to the other two entities. While Group owns Memphis Line like Lone Star owned T&N, the *Lone Star* court does not rely on ownership alone in extending common carrier status, but instead points to the physical integration that makes them mutually dependent. While Mattingly argues that Group provides significant administrative services for its subsidiary entities and the short lines use Services for bridge repair, Mattingly does not show the existence of physical integration making Group or Services a necessary part of Memphis Line's common carrier operations.

Next, Mattingly cites *Kieronski v. Wyandotte T. R., Co.*, 806 F.2d 107 (6th Cir. 1986), where the court clarified that the *Lone*

20

*Star* list should not be applied as a test, but rather as "a list of *considerations* for a court to keep in mind." Instead, the court found that "carriers can be divided into several categories," which is "more helpful." *Kieronski,* 806 F.2d at 109. The categories included in-plant facilities that are not common carriers, private carriers that are also not common carriers, linking carriers that are common carriers where "a rail entity links two or more common carriers" becoming "a vital part of the common carrier system," and the *Lone Star* category where Lone Star looks like a typical in-plaint operation, which is not a common carrier, but owns a common carrier and performs functions of that common carrier, thus becoming a common carrier itself. *Id.*

The *Kieronski* court then arranged the facts before it into the appropriate category. The plaintiff sued his employer, Wyandotte Terminal Railroad Company ("Wyandotte"), for compensation under FELA. Wyandotte was a wholly-owned subsidiary of BASF Wyandotte Corporation ("BASF"). Wyandotte's operations "were almost entirely concerned with in-plant switching for BASF" whereby on one parcel of land, Wyandotte's tracks connected to and Wyandotte received cars from one railroad and at the other parcel, Wyandotte's tracks connected to and Wyandotte received cars from another rail corporation. *Id.* at 108. The court held that Wyandotte was not a common carrier because it was simply an in-plant system.

While facts of *Kieronski* are not analogous to the facts now before the court, the case is important due to its treatment and analysis of previous cases cited by Mattingly. Importantly, the *Kieronski* court places *Southern Pacific* and *Union Stock Yard* in the linking carrier case, noting that one linked docks to a common carrier railroad and one linked common carrier railroads. The court describes how a linking carrier links two or more common carriers, becoming a vital part of the common carrier system and goes on to explain that "[t]his is true where there is common ownership between the linking carrier and a linked common carrier." *Id*. at 109. Contrary to Mattingly's contentions, there is no category whereby a non-carrier maintenance and repair entity becomes a common carrier because its parent company owns subsidiaries that own railroad companies. Mattingly has not argued nor presented facts showing that Services serves as a vital part of the common carrier system as a linking carrier. The facts before the Court do not fall into any of the *Kieronski* categories, and Mattingly has failed to provide case support for its unitary theory.

Even if there was support for finding that ownership and the providing of administrative services was enough to deem the parent company, Group, a common carrier by railroad, Mattingly has not shown how the common carrier status would then be extended to Services. At the time of the accident, Mattingly was nominally employed by Services, and Plaintiff does not argue that he was

employed by Group. Therefore, even if Group was deemed a common carrier by virtue of its ownership of common carriers coupled with its administrative oversite, Mattingly would still not be able to claim FELA liability because he admits that he was not employed by Group, a requirement for FELA liability.

Mattingly has not argued nor presented evidence that the corporate structure of the Corman enterprises was established with the purpose of evading FELA liability. Defendants have postured legitimate business purposes for the structuring as William Booher, Group's corporate representative, stated that the companies are "vastly different business. The railroads have a different set of customers, clients, suppliers, operations, you know, it's a process-based business. Whereas, you know, construction or derailment have a whole separate set of operations, customers, suppliers, and it's more project-based business." Booher goes on to explain how the entities have separate businesses and risk profile, need employees with different skill sets, and require different management groups. Plus, employees of Group's subsidiaries that admit to common carrier status, like Memphis Line, do receive the benefits of FELA.

Mattingly has failed to provide support for his argument that Group is a common carrier. Nor, by extension, has Mattingly shown that Services could be a common carrier. This is not a situation dealing with in plant rail systems or linking carriers. While Group

performs administrative functions for its subsidiaries, Mattingly has not shown that Group unites the subsidiaries into a system where all parts are necessary due to exclusivity or mutual dependance or that the subsidiaries are essential links in a chain.

### B. SUBSERVANT THEORY

Mattingly's second theory of liability argues that FELA coverage is extended to employees of entities that are not common carriers when the injured worker was acting under the direction, supervision, management, and control of a holding company and one of its common carrier subsidiaries. Plaintiff argues that even though Mattingly was nominally employed by Services, by virtue of Memphis Line's control over Services and Mattingly, Memphis Line essentially became Mattingly's employer for purposes of FELA applicability.

Plaintiff points to *Kelley v. Southern Pacific Co., 419 U.S. 318 (1974)* for birthing this concept. At the time of the accident, plaintiff, Eugene Kelley, was employed by the Pacific Motor Trucking Co. (PMT), a wholly owned subsidiary of the Southern Pacific Company. Part of PMT's duties was to transport new automobiles from Southern Pacific's railyards to dealers in the area. Kelley's job was to "unhook the automobiles from their places on the railroad cars and to drive them into the yard for further transfer to PMT auto trailers." *Kelley,* 419 U.S. at 321. While Southern Pacific employees were present in the yard and "would

24

occasionally consult with PMT employees about the unloading process, PMT supervisors controlled and directed the day-to-day operations." *Id*. The district court held that Kelley was employed by Southern Pacific withing the meaning of FELA. However, the Court of Appeals reversed finding that the "'while employed' clause of the FELA requires a finding not just of agency but of a master-servant relationship between the rail carrier and the FELA plaintiff." *Id*. at 322. The Supreme Court confirmed that "[f]rom the beginning the standard has been proof of a master-servant relationship between the plaintiff and the defendant railroad" and remanded the case to the district court "to reexamine the record in light of the proper legal standard." *Id*. at 323.

The *Kelley* court detailed the "proper legal standard" to be used for determining employment under FELA by referencing common-law principles and the Restatement (Second) of Agency, which defines servant as one who "with respect to the physical conduct in the performance of the services is subject to the other's control or right to control." *Id*. at 324. The court condensed the common-law principles to "three methods by which a plaintiff can establish his 'employment' with a rail carrier for FELA purposes even while he is nominally employed by another."

> First, the employee could be serving as the borrowed servant of the railroad at the time of his injury. Second, he could be deemed to be acting for two masters simultaneously.

25

> > Finally, he could be a subservant of a company
> > that was in turn a servant of the railroad.

*Id*. (citations omitted). The court found that, based on the
district court's findings, the third option was most applicable
but the subservant theory would still fail because the findings
did not establish the master-servant relationship between Southern
Pacific and PMT sufficient to render Kelley a subservant of the
railroad. The theory turned on the "control or right to control"
test. The court explained:

> > [T]he trial court did not find that Southern
> > Pacific employees played a **significant
> > supervisory role** in the unloading operation
> > **or**, more particularly, that petitioner was
> > **being supervised** by Southern Pacific employees
> > **at the time of his injury**. **Nor** did the court
> > find that Southern Pacific employees had any
> > **general right to control** the activities of
> > petitioner and the other PMT workers.

*Id*. at 327. Instead, the district court's finding showed that the
two companies were "closely related and necessarily had to be
coordinated," "naturally had substantial contact," and "the
evidence of contacts between Southern Pacific employees and PMT
employees may indicate, not direction or control, but rather the
passing of information and the accommodation that is obviously
required in a large and necessarily coordinated operation." *Id*. at
330.

Mattingly appears to assert the subservant theory of
employment arguing:

> [T]here is a question of material fact as to
> whether, under the *Kelley* "methods" for
> extending FELA liability for injuries to a
> worker nominally employed by a non-common
> carrier, Corman Services was actually the
> "servant" of Corman Group and Memphis Line and
> Mattingly, as a subservant, is deemed, for
> FELA purposes, an employee of Corman Services,
> Corman Group and Memphis Line.

[DE 62, Mattingly's Memorandum in support of Application of FELA,
at 40]. In order for FELA to attach under this theory, the nominal
employer's master must be a common carrier by railroad subject to
FELA. As Group is not,[2] Mattingly must establish a master-servant
relationship between Services and Memphis Line. Establishing the
requisite control under the master-servant analysis "does not
require that the railroad have full supervisory control...only
that the railroad, through its employees, plays 'a significant
supervisory role' as to the work of the injured employee." *Lindsey
v. Louisville & Nashville R. Co.*, 775 F.2d 1322, 1324 (5th Cir.
1985); *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1350
(3d Cir. 1991).

## 1. CASES

Mattingly attempts to distinguish two Sixth Circuit cases
that applied *Kelley* and found that there could be no coverage under

---

[2] Even if Group was a common carrier by railroad, Mattingly has not established
that Group attempted to control or had the right to control the manner or
details of Services' repair work or that Mattingly was being directly controlled
by Group employees at the time of his injury. Mattingly has not argued that
Group supervisors were present on the Memphis Line Project , nor that a Group
employee ever gave him an order related to the project, nor that Group was
involved in the day-to-day activities on the Memphis Line Project.

FELA. *Campbell v. BNSF Ry.*, 600 F.3d 667 (6th Cir. 2010); *Zeller v. Canadian Nat'l Ry. Co.*, 666 F. App'x 517 (6th Cir. 2016). Defendants rely on the two Sixth Circuit cases and cite two other factually similar cases that support the absence of FELA liability. *Royal v. Mo. & N. Ark. R.R. Co.*, No. 4:15-cv-04008, 2016 U.S. Dist. LEXIS 109071 (W.D. Ark. Aug. 17, 2016); *Thomas v. Union Pac. R.R. Co.*, No. 4:16-cv-04052, 2018 U.S. Dist. LEXIS 132160 (W.D. Ark. Aug. 7, 2018).

In *Campbell*, plaintiff Michael Campbell, while employed by Pacific Rail Services, LLC ("PRS"), was driving a railroad transport vehicle at a rail yard owned by defendant BNSF Railway Company f/k/a The Burlington Northern & Santa Fe Railway Company ("BNSF") at the time of his injury. *Campbell,* 600 F.3d at 668. Despite Campbell's argument that he was an employee of BNSF for FELA purposes, the Sixth Circuit affirmed the district court's holding that that there was no master-servant relationship between BNSF and PRS or between BNSF and Campbell. By contractual relationship, PRS operated BNSF's terminal in Memphis, Tennessee. *Id*. at 669. Although BNSF supplied some material and employed a hub manager at the terminal who was charged with ensuring PRS workers timely completed the work and adhered to BNSF's safety protocols, PRS provided equipment, conducted safety training, made hiring decisions, handled disciplinary matters, and PRS

28

supervisors were responsible for directing the specifics and managing works schedules. *Id.*

Applying the principles set out in *Kelley*, the court held that the "undisputed evidence demonstrates that BNSF had no right to control, nor did it attempt to exercise control over, the manner and details of PRS's work" and did not even have the personnel in place to do so because BNSF only employed one worker at the terminal and "his role was limited to observation, rather than control." *Id.* at 673. PRS employed its own managers and supervisors who held safety meetings before each shift and directed the work. "BNSF also played little, if any, role in Campbell's accident" as "PRS employed Campbell and the worker who rear-ended him, and it owned both of the hostlers involved in the accident." *Id*. The court found that Campbell did not establish that BNSF retained the requisite control by obligating PRS to conform to BNSF's safety requirements because "PRS was responsible for implementing these policies on a daily basis" and it was reasonable for the BNSF, as the property owner, "to be concerned about workers performing potentially hazardous work on its land." *Id.* at 674.

In the second Sixth Circuit case that Mattingly attempts to distinguish from his own situation, Plaintiff Sarah Zeller was a customs analyst for CN Customs Brokerage Services (USA), Inc. ("CNCB"). *Zeller*, 666 Fed. Appx at 519. Canadian National Railway

Company ("CNR") owned subsidiaries which in turn owned CNCB.[3] The district court rejected Zeller's FELA claim against CNR. The Sixth Circuit affirmed noting that Zeller has not "provided any evidence of a master-servant relationship sufficient to raise a question of fact concerning her relationship to CNR for the purposes of FELA" and emphasizing that "Zeller has identified no one other than CNCB personnel who supervised or controlled her activities as a customs analyst." *Id.* at 527. Despite the fact that a CNR-CNCB employee oversees the daily operations of CNCB and signed Zeller's offer letter, "there is no reason to assume that [the CNR-CNCB employee] acts in her capacity with CNR" when she manages and directly supervises, CNR did not pay Zeller, nor could CNR discipline or discharge Zeller. *Id.* at 528.

Defendants point to a factually similar case where plaintiff Shawn Royal was employed by North American Railway Services ("NARS"), which while not a common carrier, performed work on railroads. *Royal v. Mo. & N. Ark. R.R. Co.*, No. 4:15-cv-04008, 2016 U.S. Dist. LEXIS 109071, at *2 (W.D. Ark. Aug. 17, 2016). NARS entered into a contract with RailAmerica ("RA") to do work on one of RA's railroads, Missouri and Northern Arkansas ("MNA"), a

---

[3] Zeller, 66 F. App'x at 519. "CNCB was a wholly-owned subsidiary of IC Financial Services Corporation, which was, in turn, a wholly-owned subsidiary of Illinois Central Corporation, which was, in turn, owned by Grand Trunk Corporation. Grand Trunk Corporation was a wholly-owned subsidiary of Defendant Canadian National Railway Company ("CNR"). CNCB performs its services for CNR as well as for hundreds of other customers."

common carrier by railroad. *Id*. at *2. When Royal was injured while operating a ballast regular, Royal brought suit seeking relief under FELA. *Id*. at *3. MNA argued it was entitled to summary judgment because Royal was not an employee of the railroad. *Id*. at *13. Applying the analysis from *Kelley*, the court granted the motion for summary judgment finding that "[t]he evidence of whether MNA controlled NARS is not in dispute, and a reasonable jury would not find that MNA either controlled or had the right to control the work of Royal on the day of the accident such that Royal would be considered an employee of MNA." *Id*. at *18.

The court found there was no evidence that MNA controlled or had the right to control Royal's actions despite the fact that MNA had "general oversight over the job NARS was performing", "NARS was required to perform its work 'to the satisfaction and acceptance' of MNA" including maintaining "specific engineering specification and workmanship practices," NARS was required to provide status reports, MNA had a project engineer that could conduct periodic inspections to verify quality of workmanship and adherence to schedules, MNA employed an EIC who "would give the parameters of track and time, and tell them when it was clear to work...had the authority to stop the job...would inspect the track at the end of the day and inform [Royal's supervisor employed by NARS] if there was something that needed to be done differently...had the right to order NARS employees off the

31

property if they were not performing their job safely or correctly," and the NARS supervisor "would communicate with the EIC concerning where they were working, what time they needed to come back, and, if there was a specific concern, he would call the EIC and seek guidance on how to handle it." *Id*. at *15-*17.

The court iterated that NARS, not MNA, hired and paid Royal, was responsible for implementing a safety program, had authority to discipline, trained employees, "makes all decisions regarding which equipment and personnel are necessary to complete the job," owned the equipment used by Royal, the majority of work done by NARS is performed for railroads other than MNA, no one expressed to royal he was an employee of MNA, Royal admits that MNA did not control and direct how he did his work, and Royal considered his chain of command to be only NARS employee. *Id*. at *15-*16. Even though the EIC had the ability to tell NARS supervisors if something needed to be done differently after inspection, the court found that Royal's chain of command consisted only of NARS employees. The court held that the evidence shows only that MNA had "general inspections rights" over NARS and any direction was limited to general oversight. *Id*. at *18. "[T]he ability of MNA to inspect work and enforce safety regulations on their tracks does not amount to control as required to be considered an employee. The right to stop and inspect work for compliance is

32

distinguishable from the right to control the manner of compliance." *Id*. at *17-*18 (citation omitted).

Defendants next cite to another factually similar case where Plaintiff Austin Thomas was employed as a bridge repairman by Rail 1, LLC, ("Rail 1") when he fell off a railroad bridge owned and operated by Union Pacific Railroad Company ("Union Pacific"). *Thomas v. Union Pac. R.R. Co.*, No. 4:16-cv-04052, 2018 U.S. Dist. LEXIS 132160, at *1 (W.D. Ark. Aug. 7, 2018). Rail 1 had been hired as a subcontractor by Jay Construction to do the repair for Union Pacific. After being told that the previously installed guard timbers were crooked and needed to be fixed, Thomas fell off the bridge while complying with the order. A Union Pacific employee, Charles Mann, and a Rail 1 foreman, Kelvin Crecelius, were at the job site, but the parties disagree as to who ordered the guard timbers to be fixed. *Id*. at *2. Thomas sued Union Pacific under FELA, but the railroad filed a motion for summary judgment arguing that it was not Thomas' employer pointing to a contract that explicitly denounced agents of Jay construction as "employees", stated that Jay Construction would be responsible for removing inadequate workers, compensation, and providing equipment and labor. Thomas testified that he was a Rail 1 employee, worked out of a Rail 1 truck, used Rail 1 tools, and that Crecelius directed him to pry up and redo the crooked timbers. *Id*. at *9-*10. Mann testified that he had no right to hire or fire Rail 1 employees

33

and never directly assigned tasks to Rail 1 employees, but just provided the scope of work.

Thomas argued that summary judgment was inappropriate because his co-worker, Frederick, testified that Rail 1 employees were under the direct control of both Mann and Crecelius, that Mann gave the crew "direct orders" and they did "exactly what [Mann] said at all times, no matter what," Mann gave daily briefings which included "what we were doing that day," and Mann gave the orders to fix the incorrectly installed timbers. *Id.* at *11.

The *Thomas* court held that a reasonable jury could not find that "Union Pacific controlled or had the right to control Thomas's work at the time he was injured." *Id.* at *15. Thomas considered himself employed by Rail 1, was compensated by Rail 1, and used Rail 1 tools. Even though Frederick testified that Mann gave Rail 1 crew members "distinct orders," the evidence did not show "that Mann or Union Pacific had the right to control Thomas or any other Rail 1 crew members' work" because, other than the order to fix the guard timbers, Thomas did not point the court to any evidence of specific orders and Frederick stated elsewhere that Mann "didn't make sure your T's crossed and your I's dotted," which shows only that Mann had general oversight authority. *Id.* at *16. "As in Royal, the fact that Union Pacific had the ability to inspect Rail 1 employees' work and require them to adhere to safety regulations and workmanship practices is immaterial to the question of whether

34

Union Pacific had control or the right to control Thomas's job performance." *Id*. at *16-*17. Assuming that Mann gave the orders to correct the guard timbers, the court still found summary judgment proper because "Mann did not specifically tell them how to go about fixing the guard timbers" and at the time of the injury "Mann was acting within his authority to ensure that Thomas and Frederick corrected non-compliant work rather than exercising direct control over the means and manner of completing the work." *Id*. at *18-*19.

### 2. APPLICATION

First, Mattingly has now shown that Memphis Line employees had the general right to control nor generally controlled the physical conduct of Mattingly or Services or that Memphis line employees played a significant supervisory role.

Defining the scope of work by issuing a work list specifying which posts need to be removed is not controlling the details of the work, rather it is illustrating the goal to be accomplished, which is a necessary step anytime that contractors are hired for a job. *Atlas v. Union Pac. R.R. Co.,* 2019 IL App (1st) 181474, 435 Ill. Dec. 270, 138 N.E.3d 884(holding plaintiff was not the subservant of the railroad even though plaintiff contended that the railroad instructed plaintiff "on which locomotives to service and the order in which to service them" and plaintiff "would receive a list of locomotives that needed to be serviced" because

35

plaintiff would "then set about his job alone, without any direct supervision from the railroad" which is the "level of contact" that "indicates nothing more than the necessary coordination of a complex railroad operation").

Mattingly admitted that he chose where he wanted to work every morning. Assuming there were times when Memphis Line employees gave Mattingly specific instructions on which posts needed to be prioritized due to a new limited timeframe, Plaintiff has not argued that Memphis Line employees told him how to carry out that work. This is an example of Memphis Line altering the scope of work by removing low priority posts from the work list. Similarly, informing the Services crew that a train was coming through at a certain time is not Memphis Line employees controlling the details of the physical work, but rather informing the crew of incoming traffic so that the crew could figure out how to manage their time and prioritize tasks for the day. This is the type of communication necessary in large scale productions. After being told the train schedule, it was Services' responsibility to complete the work in a timely manner.

Although Mattingly makes conclusory claims that on Corman railroad related projects the EICs tended to instruct workers where to go and what to do, [Mattingly Deposition, at 69], when detailing the specifics of his day on the Memphis Line Project, Mattingly admits that he gave his crew their assignments every morning,

assigning the crew to equipment, ensuring the necessary tools were obtained, locating the material, and choosing which spot he wanted to work on that day.

That an EIC or Memphis Line supervisor required posts adhere to a certain standard and quality, in others words "wanted it done his way," and required posts be cut properly shows only that Memphis Line had general oversight. In *Royal*, despite the fact that NARS was required to maintain specific engineering specification and workmanship practices, the court explained, "[t]he right to stop and inspect work for compliance is distinguishable from the right to control the manner of compliance." 2016 U.S. Dist. LEXIS 109071, at *18.

While Mattingly and Childres testify that Memphis Line supervisors worked alongside them at times, participating in the physical tasks in conjunction with the Services crew does not equate to Memphis Line supervisors controlling how Services employees performed the physical task.

Though Mattingly points to Topolski's admission that he advised Services bridge crew members how to perform their tasks [DE 62-1 at 38], looking to the context of Topolski's testimony, the Court does not find that Topolski was *controlling* the details of the crew's work, but was instead answering questions regarding the scope of the work, explaining how he used to cut posts, and describing what it should look like in the end. [Topolski

37

Deposition, at 97-84]. This behavior is in line with ensuring specific engineering specification and workmanship practices were followed similar to *Royal*.

The presence and usage of EICs alone does not mean that Memphis Line was controlling Mattingly or Services' work. The presence of an EIC is common on similar jobs and necessary under federal regulations. In *Campbell*, the court found the railroad was not exercising control over the manner and details of plaintiff's work even though the railroad supplied a hub manager at the terminal charged with guaranteeing timely completion of work and adherence to safety protocols as the plaintiff's employer retained its own managers and supervisors. Ensuring that the Services crew was safe and that train traffic would not put the crew in danger is not proof of controlling Plaintiff's work. Plus, services retained their own supervisors who instructed and directed the crew.

While the frequency with which a Memphis Line supervisor is present may be indicative of their tendency to exhibit control over Services employees, it is not conclusive. Though there is conflicting testimony regarding how often Topolski was present at the Memphis Line project, assuming Topolski was present at the site as often as Mattingly claims, basically everyday, Topolski's uninterrupted presence does not equate to control over the details of the work. For example, that an EIC from Memphis Line is

constantly present to communicate with dispatch to ensure that the repair crew can safely occupy the track is not proof of control over details of the physical work.

Although Mattingly considered Memphis Line employees to be his supervisors, Mattingly admits that he was also his own supervisor and he considered his two bosses to be Dillon and Childres. While Mattingly claims he would adhere to orders from Memphis Line employees when on site, Mattingly does not point to specific orders of Memphis Line supervisors instructing him on the details of his own physical work and admits that he picked where he worked everyday. While the chain of command can be indicative of control, that repair crew feel inclined to follow orders of the railroad EIC or other railroad employee, especially when related to track and time authority and safety, is not tantamount to the railroad having the right to control the details of repair crew's work. Plus, the repair crew testified that they would first follow Childres and Mattingly.

Even if Memphis Line supervisors instructed Services to have one crew work on the Cumberland Bridge while the other crew worked on the Red River Bridge, such direction does not implicate the kind of control over detail discussed in caselaw. In ordering two projects be worked on, Memphis Line supervisors were not telling the crew how to do the specifics of those jobs. Instead, the decision to work on both projects at once is an example of Memphis

39

Line supervisors setting the scope of work to ensure the best usage of company resources as there were two crews worth of Services employees, two sets of tools, and two bridges that needed repair.

That Services was required to send daily production reports does not establish a master-servant relationship. Production reports were common on similar jobs to update owners of progress in order to gauge the amount of time remaining for completion of the project so that lines could be reopened. The reports were sent after Services had completed their work for the day and summarized their accomplishments. That Memphis Line was informed of the details of their work, does not mean that the Railroad was controlling the details. Mattingly argues that Services was controlling the manner of the reports as Topolski and Quillian responded with critiques in emails. However, asking Mattingly to include the exact location of work completed and include the post number in further reports does not exhibit control over details of Mattingly's work. To the contrary, it shows that Memphis Line supervisors were unaware of the details of Services' work for the day, and needed to be relayed those specific details in the evening in order to keep their records organized. Just like any other railroad line, Memphis Line needed to know which posts were replaced so the proper inspections could be conducted and so that posts that were not replaced could be added to a future project. Further a railroad needs to know what material was being used to

monitor expenses, know when new material may be needed, and learn for future projects how to estimate material needs and costs.

That Memphis Line employees provided the material for the bridge repair and even specified what material should be used on specific posts is not indicative of control over details. In *Campbell,* the court found that despite the railroad supplying some material, plaintiff did not prove the requisite control. As the railroad was providing the posts and would need to arrange to get more if Services ran out, it was proper for the railroad to specify that the longer posts should not be cut when shorter post were available so that the longer post could be conserved for necessary use. Ensuring that the material provided was able to last for the repair is not controlling the details of the work.

That Memphis Line supervisors participated in or even led the daily morning safety meetings is not determinative. Mattingly does not argue that the purpose of the safety meetings was to obtain or assign specific tasks for the day or explain how to implement those tasks. Due to the nature of the job, safety meetings were a necessary facet of railroad bridge repair work. As explained in *Campbell*, it is reasonable for the bridge property owners to be concerned about workers performing potentially hazardous work on its land. Participation in or even occasionally leading a safety meeting, focusing purely on safety, before beginning work for the day is not an example of the railroad exhibiting control over the

41

repair crew, especially when Services was responsible for implementing the policies on a daily basis.

Services did not perform bridgework exclusively for Railroad Company, but had other clients, and Railroad Company solicited bids from other repair teams. That Services was only charging the market rate or that Services ended up doing most of Railroad Company's repair work is not determinative.

Mattingly has not argued that Memphis Line employees had the power to or ever did discipline or terminate him or other Services employees. Similarly, there is no indication that Memphis Line was involved in the hiring of Services employees for the bridge work. Mattingly has not indicated that the equipment used to perform the bridge work was provided by Memphis Line. While Mattingly does cite deposition testimony that Topolski trained Services crew members how to use a "man lift" and showed new Services employees how to drill a hole, Mattingly does not point to evidence that Memphis Line played a significant supervisory role in training Services crew members. Mattingly was required to track his own expenses, which he sent to Services. And Mattingly was paid by Services for his work on the Memphis Line Project. Services made decisions regarding which equipment and personnel were needed to complete the job. While Services is distantly related to Memphis Line through their corporate structure, Services maintained its own supervisors, employees, and other customers. The worklist,

42

defining the scope of work, safety meetings, track and time duties, and production reports are the type of contacts necessary in a large and coordinated operation as explained in *Kelley*, and not evidence of direction or control.

Second, Mattingly has not shown that Memphis Line was exercising control, nor had the right to, at the time of Mattingly's injury. In addition to finding no right to control or attempt to exercise control over plaintiff, the *Campbell* court iterated that the railroad "played little, if any, role in Campbell's accident" as "PRS employed Campbell and the worker who rear-ended him, and it owned both of the hostlers involved in the accident." *Campbell*, 600 F.3d at 673. Similarly, it is undisputed that Memphis Line employees had little, if any, role in Mattingly's accident as only Services employees were present, only Services employees controlled the equipment associated with the accident, and no Services employee, including Mattingly, was following the direction of a Memphis Line employee.

The absence or presence of Memphis Line supervisor at the time the injury occurred is not dispositive as one can control the details of a person's work without being physically present, if for example, the worker was following the detailed instructions listed by the supervisor when the accident occurred. Nonetheless, Mattingly does not argue that on the day of his accident he was following instructions from a Memphis Line supervisor. Mattingly

43

has not asserted that when he attempted to retrieve the chains from Childres, he was under the direction of anyone from Memphis Line or was using equipment provided by an entity other than Services. He was retrieving replacement chains from a Services employee, whom Plaintiff considered to be his supervisor, for use in the completion of his duties. Plaintiff has failed to prove that *at the time* of the accident Memphis Line was controlling the details of his work.

In *Thomas*, even though the railroad worker, Mann, was present at the scene and assumedly gave the order to fix the guard timbers that resulted in the injury, the court still found the requisite level of control was not met because Mann was acting with general oversight authority, which included the right to inspect and demand compliance with regulations and Mann did not tell Thomas *how* to fix the guard timbers. Here, in stark contrast, no one from Memphis Line was even present at the time of the accident nor has Mattingly argued that he was following orders from anyone at Memphis Line at the time of the accident. *Thomas*, 2018 U.S. Dist. LEXIS 132160, at *18.

A reasonable jury could not find that Memphis Line either controlled or had the right to control the work of Mattingly on the day of the accident precluding Mattingly from being a subservant of Memphis Line.

44

### IV.   CONCLUSION

For the reasons stated herein, Defendants' motion for summary judgment on the FELA issue is granted. Mattingly's unitary theory of liability is not supported by the law and Mattingly has failed to present adequate evidence from which a rational jury could find that Memphis Line controlled or had the right to control his daily work at the time of his injury. FELA does not apply to Plaintiff's injury claim.

While only Group and Services filed the motion for summary judgment, the Court recognizes that the third defendant, Memphis Line, was not a part of the action until Mattingly's motion to file a second amended complaint was granted, which occurred after the deadline for filing dispositive motions. Because the Court's findings clearly apply to Memphis Line and preclude the applicability of FELA, the Memphis Line defendants are included in this order and corresponding judgment. Therefore, **IT IS HEREBY ORDERED** as follows:

(1)  Defendants' Motion for Summary Judgment [DE 63] regarding the applicability of the FELA to his injury claim is **GRANTED**;

(2)  Plaintiff's Motion for Partial Summary Judgment [DE 62] regarding the application of FELA is **DENIED**;

(3)  A corresponding judgment will follow.

This the 12th day of August, 2022.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge